Good morning, Your Honors, and may it please the Court, my name is Walter Woodruff, and I represent Cali Capital Management, LLC, who is the plaintiff in the lower court and who is the appellant in this court. It is perhaps ironic that 12 v. 6 was rarely granted, but yet you have been asked to review 12 v. 2 back-to-back. Our case involves more than just a 12 v. 6 ruling, it also involves a 12 v. 2 ruling, and also when it is rejected and accused of its discretion in denying another opportunity to amend. But the issue, I think, of cardinal significance, Your Honors, is the dismissal on the 12 v. 6. Score is a digital media company that solicited an investment from my client and used three implements in making its pitch. One was a business plan, another was a brand's capability deck, and a third was an agreement with FC Bayern Soccer Club in Europe.  Interestingly, the district court found that the business plan did contain misrepresentations and false information, but decided that my client had not pleaded with particularity facts that she demonstrated that they acted with the requisite state of mind in promulgating and promoting that false information. Most importantly, the district court used the group pleading doctrine to say that we identified no speaker, but I believe the complaint says, Your Honor, that the business plan was created and or approved by Score and all the defendants. The group pleading doctrine, as I understand it, does not allow you to attribute a statement to a group of people without knowing which in the group said it. These allegations, properly understood, said they all did it, they all created it, they all had a hand in it, and they all used the information to solicit the investments. But you're running around the point of rule. You're supposed to be able to say exactly what they said so that the defendant knows what he's answering to. Well, Judge Ali, I agree, and I think they do do that. I mean, the foundational allegation is found in paragraph 42, but aside from the business plan itself, these people spoke and promulgated and utilized this misinformation in face-to-face meetings, telephone conversations, and in written correspondence. So even aside from the business plan, even if you don't know who created it, even though we've pleaded, we've alleged who did, they still utilized that false information, which the district court agreed was a misrepresentation and false. They utilized it to solicit the investment, and it worked. My people invested $16.9 million into this venture. So there's that business agreement and the business plan, which speaks for itself. Then there's the F.C. Barron agreement. Now, that agreement was represented and shown to my clients as a standard agreement. That agreement said what it said. My clients read it. They represented that they were going to go get it signed, and they did go get it signed. But after getting it signed, they omitted and refrained from telling them that the standard deal had changed, and it changed in consequential and meaningful ways. It changed because whereas Bayern Munich, the standard draft, said use the obligatory shall, it now changed to the discretionary, we use its best efforts. And there's a big difference between the obligatory shall. And this was a key implement in the artifice that was perpetrated on my client. And my client realized that if F.C. Barron is signing an agreement, and it's the fourth it has wings, it has legs, but they completely changed it. And they omitted telling my clients that the deal we presented to you or showed you that was standard became substandard, and here's why. They never said that. And again, as in the case with the business plan, they didn't make these corrections, and we allege they didn't make these corrections because they were trying to forestall legal action, they were trying to separate my clients from more money, and it worked. And then the third thing is the brand capability deck. The brand capability deck, which is a PDF which demonstrates the capabilities of a company, made material misrepresentations. And again, the lower court held that the group pleading doctrine again precluded the advancement of that claim to trial, and I think that was error again because the information that was on the brand deck was promulgated and communicated again in person, face-to-face conversations, telephone conversations, Skype conversations, and in written correspondence. So here again, you've got misleading information. We've pleaded what's misleading, how it's misleading. We've also pleaded the requisite facts to demonstrate that they acted with the state of mind that they did. And, you know, a lot of the judge's opinion to me seems to point out all the ways in which my client could have pleaded a more precise case, but the inquiry here, Your Honors, is whether they pleaded precisely enough, not whether they could have pleaded more precisely. So on the 12B-6, we believe it was error. This court reviews that de novo, and we're asking you to find that they did plead or did supply misrepresentations and that we've at least alleged in our pleading that they acted with the required state of mind. Apropos the 12B-2 dismissal, Demetrius Bakadakis, who is a board member and a shareholder of SCORE, who is a— Why, though—I'm just curious—why have you placed so much of the appeal on him? Is he a deep pocket or what? Well, I've never counted his money, Judge Jolly, but he did play a significant role and perhaps he is a deep pocket, but he played a vital role because he was in boots on the ground in Germany. The FC Baren agreement was important. That is a German soccer club. And, you know, he traveled to the United States generally. He traveled to Louisiana in particular and made substantial representations. Why do you want him worse than anybody else, or do you? I don't think we want him worse than anybody else, but we want everyone in that contributed to the fraud. And he played a central and pivotal role in that, according to our allegations. What would be the correct disposition if we—assuming, arguendo, we agree with you that there's personal jurisdiction over Bakadakis? Yes, sir. But we otherwise—I think the district court got it right. What would be the proper disposition? Well, that would be a pyrrhic victory in my opinion, Your Honor, because if we fail to allege calls of action as to any of the defendants, whether this court has—or the lower court has jurisdiction over him would be a moot point almost. But, of course, it's hard to imagine that you'll find that, at least from my perspective. But, yes, it would be moot, which then kind of brings me to the third point, which is assuming there's merit to both rulings that we're here challenging. Rule 15 almost commands that when justice requires it, a chance at amendment be granted. We believe justice so requires. We also believe that these deficiencies could be corrected. I mean, we could come forward with more specific facts. Rather than saying everyone in the group is responsible for this misrepresentation, everyone in the group is responsible for this omission, if the court would want us or would think it would be more precise and meet the standard, we could have said, Ryan Wilhite did this. Worland did this. I think there's a little different slant on it to what Judge Willett said, perhaps, is how are you prejudiced by his absence? How are we prejudiced by his absence? Well, you're always prejudiced by an empty chair if defendants can point the finger at the . . . By what? By an empty chair. I mean, if the other defendants can point the dirty end of the stick . . . That's group pleading. I beg your pardon? That's group pleading when you say you're always prejudiced by an empty chair. I mean . . . Well, no, but, I mean, as a general rule, a co-defendant always runs the risk of an empty chair if they could then point the dirty end of the stick at Mr. Bakadakis, who's not there to defend himself, who's not there to say, well, no, it was really this or that. I mean, it would obviously be prejudicial for us to try the case missing a key and vital defendant who played a key and vital role in the fraud. Well, I mean, can you be more specific than that, how you would be prejudiced? Well, I mean, we'd be prejudiced to the extent that perhaps Mr. Bakadakis is the only one who can speak to what happened at that face-to-face meeting in Louisiana and, more generally, the face-to-face meetings in the United States, what claims are attributed to him, what statements, what representations he made. Those play a vital role. I mean, and as you know, Judge Jolly, the complaint has to be reviewed in aggregate. I mean, you have to review this complaint in whole to determine whether it states a cause of action, and Mr. Bakadakis, even though he's only mentioned five times in here by name, he did play a vital role. So I don't think there's any serious question in my mind that my clients would be prejudiced if they had to move, forge forward and try this case with Mr. Bakadakis absent. Your Honors, the Private Security Litigations Act was enacted and passed to prevent frivolous lawsuits. I understand that. This is not a class action. This is an individual company going against five or six individuals. It would not be extensive discovery, and it's not an insignificant case. It was $17 million, nearly $17 million invested, and as I said in the closing of our first brief, it would augur ill for people in my client's position if this court would uphold the 12v6 ruling. It would really leave people who have been defrauded at a disadvantage because they didn't plead something precisely enough. They have pled this precisely enough. You know, we could debate all day long whether it could have been more precisely pled and perhaps it could, but that is not the standard of the measure. The measure is, are these facts sufficient to relate misrepresentations and omissions? And one big thing that I think the lower court missed on the F.C. Barron agreement is it wasn't a statement. It was an omission. It was a negligent omission, not a negligent, it was an intentional omission not to tell my folks, hey, this deal that I represented to you is standard, was not standard. Remember, none of the, no one in county management signed that agreement. They were not signatories to that agreement, but that agreement was a major tool and a major lever that moved my people from I'm not sure this is a good investment to hey, this really looks like a good investment, and as it turns out, they were wrong. They were gross disparities between what they represented in the business plan, in the brand capability deck, between what was represented and what was actually truth. And it was Bakadakis' representative who finally told the Kelleys, look, this has all been a sham. This has all been a sham. You've been taken. So with that, I see I still have some time. If there are no further questions, I'll reserve the balance of my time for rebuttal. Mr. Woodruff, thank you very much. Thank you, Your Honor. See you back in a few minutes. Mr. Johnson, the floor is yours. Thank you, Your Honor. And if it please the Court, I'm Greg Johnson. I'm a partner at the law firm of Lewis, Brisbois, Biscard, and Smith. I'm here today on behalf of the appellees, Brian, Emily Wilhite, Brian May, John Gregg, Brett Favre, and Demetrius Bakadakis. And true, we are here to review three decisions by the district court, and I respectfully submit, Your Honors, that those decisions should be affirmed in their entirety. First, let's look at the misrepresentations that counsel discussed with respect to the business plan and the brand capabilities deck. The court below lumped those together and found that they had adequately alleged some falsity in those documents. The court did not find contrary to counsel's representation that the court found there were fraudulent statements in there, only that there were allegations that there were fraudulent statements in there. So I want that cleared up. But moving on to what the court focused on, that was the absence of a maker of those statements, the failure to meet Rule 9 PSLRA pleading standards to allege the maker of the statement. Janus Capital, the United States Supreme Court case, lays out the standard for what constitutes a maker. And a maker is the person with the ultimate authority to create content and to distribute both as to manner and timing of that content. That's a maker. The problem with their complaint is that there's no functional equivalent of that. There's nothing that speaks in terms of ultimate authority. There's nothing that speaks in terms of authority on the timing or the manner of the distribution of the statement. To further compound the problem, there's no tie to any statement in the business plan or the brand capabilities deck to any of the litany of people that they list, the six people that they list as candidates. No one is tied to a specific statement in either of those documents. But yet, they take the position that the statement that SCORE, the Pontchartrain defendants, Wilhite, May, and Worley, and as to the brand capabilities deck, they add Greg, created and or approved the business plan and the brand capabilities deck. And they say that gets us away from the Southland Prohibition on group pleading. The problem is they're not telling you the full story. Because going back to Janus, the Supreme Court case in Janus, the United States was allowed to participate in that appeal as an amici. The SEC argued to the Supreme Court that create, the very word that they use as part of their complaint, the SEC said, please hold that create is another category, is synonymous or is equivalent to make. The Supreme Court put it in quotes, create. They said, we will not do it. We will not expand the scope of Rule 10b-5 to include creators because if that's going to happen, that's properly the role of Congress to expand the liability scope of Rule 10b-5. So they rejected create as an actionable verb. But yet, the Calais complaint contains create and slash or approve. But then they say, that gets us away from the group pleading doctrine. I'll submit to your honors, rather than get them away from the group pleading, that construction puts them deeper into a group pleading hole. And here's why. You've got three buckets now under their construction. You've got a create bucket, or you have an approve bucket, or you have a create and approve bucket. So they've got six people that they've identified and they say, these people were creators and or approvers. So you've got six people, three buckets. Doesn't take an advanced math degree to recognize that that creates dozens of permutations, dozens of possibilities of who created, who approved, who created and approved. So they've created for themselves by relying on this hallmark allegation that they claim gets them out of the group pleading doctrine, yet actually buries them under the group pleading doctrine. Counsel, would you agree that the person who approves the brand capability stack has made the statements in the brand capability stack? Yes, Judge Oldham, that is correct. Approved. But the cases that recognize approve, approve with facts, specific facts that establish the ultimate authority, the ultimate authority as to content, the ultimate authority as to timing, and the ultimate authority as to manner of distribution. So yes, I agree. Afford with more. In other words, you can't just plead the conclusion so-and-so approved, therefore so-and-so is liable. The PSLRA, all of the interpretive case law, make abundantly clear. You cannot use conclusions. You have to plead facts. They have to be specific as to time, manner, and place, and the identity of the individual that uttered the statement. The complaint is woefully deficient, woefully deficient, and trying to salvage it with this create and or approved language doesn't even come close, doesn't even come close. And I think the Southland case, Judge Jolly, you're probably well familiar with your work on the Southland case, specifically rejects the use of or. It was this person or this person. So even though they have an and between score, poncho train, blah, blah, blah, and orly, the fact that they embed the disjunctive or with the verb, not the actors, creates the problem that Your Honor, Judge Jolly recognized in Southland. So they are violating the group pleading rule. The district court was absolutely right about that. Counsel, suppose that they have the facts to support an allegation that Defendant A approved the brand capability stack. So just assume that's true for a second. And then they say in the next paragraph of the complaint, Defendants B, C, and D went to a pitch meeting and presented the brand capability stack and read from sentences in it and urged the investors to invest and repeated the various bullet points that are in the brand capability stack. Do B, C, and D now come in? Is that sufficient? Is it B, C, and D? It could be sufficient if they have knowledge of the falsity. Because remember, scienter is still a requirement here. And unfortunately or maybe fortunately, Judge Bitter didn't get to that issue. I'm just focusing on the making of the statement. The maker? Yeah. Yes, I think that people who reiterate knowingly false statements and have the scienter, satisfy the scienter requirement, yes, I believe repeating a known falsity, yes, is a republication and is actionable. Now let's talk about the F.C. Baird agreement for just a bit. It is difficult to understand how it is fraudulent to present a draft agreement to someone and say, this is the standard and then a few days later give them the final and say this is the final. They obviously, because they did it in their briefing, they obviously have the capacity to compare the draft with the final because they told us here were the material or the important things that were different from the draft to the final. So how can that be fraud? They had the draft. They had the final. They still, after that, had two loans that they made. So if that was important to them, they haven't explained why they didn't notice it and then withhold the next two loans. More fundamentally, however, they never explained why it was important that the standard draft agreement be the same in the final version. In other words, there's a materiality problem here. There's no allegation that they communicated that the standard needed to be what got incorporated in the final. Therefore, how could anybody have an intent to mislead them or omit to say something if they don't know the materiality of something? And this is what the court found. The court was puzzled by this. And that's why the court said, look, bait and switch. It doesn't make any sense. Then they come back on appeal and they say, no, no, no, the district court misunderstood. Our theory of liability there is that there was no mission to tell them that the final was not the standard. But they admit they could see it. So what was withheld? What was omitted? It's a fraudulent non sequitur. And the only way they could surmount that problem is if they had specific allegations that was communicated. I'm relying on you to make sure your standard is transposed into the final. I'm not going to be reviewing it, so I'm counting on you to make that happen. Will you do that? Then if somebody says, you betcha, we'll take care of that, then you might have an actionable fraud. But on these facts, no actionable fraud. So let's now turn to the decision with Demetrius Bakadakis and the grant of the 12b-2 motion. Nowhere in the complaint do they allege that Demetrius Bakadakis said anything to them to cause them to part with any of their money. They say he was integral. They say he was important. They say his role was central because he was doing things in Europe. They say he came here for two meetings, one after all of this fell apart, one before, and then one Skype call. And they say on that record, it's fair to subject Mr. Bakadakis to jurisdiction in the United States. But we said no. No. He did not participate in those activities in his personal capacity. Why do they want him in here so badly? Or do they? I think they do. I think they see him because of his European – They focus a lot of their appeal. What's that? They focus a good deal of their appeal just simply on that one person. They do. And I was wondering why. My gut is the same as yours, Judge Jolly. They're looking for deep pockets. The same thing with Brett Favre. Read the complaint. Where do they say Brett Favre misled them on anything? Nowhere. Brett Favre was important. Brett Favre gave panache to the enterprise. Brett Favre gave credibility to the enterprise. But nowhere do they say Brett Favre told them a lie. Nowhere. They don't even plead how he was involved in the business plan. They don't plead how he was involved in the brand capabilities deck. This complaint is the epitome of group pleading and taking liberties with the PSLRA pleading standards. There's a lot in here. They say a lot. But just as Judge Vitter concluded, we don't know the who, how, why, when of these fraudulent statements. They've alleged they're fraudulent. They allege they relied on them. They allege that they caused them losses. But those are all conclusions. There's no facts that give the required strong inference that there was any fraud going on here. And as I said, you take a look at the F.C. Baird Agreement. Fraudulent legal non sequitur. The documents speak for themselves. They had the standard. They had the final. Apparently didn't compare them until they got to the complaint stage. But yet they went ahead and made two more loans after they had the final of the F.C. Baird Agreement. Coming back to, before my time expires, I want to come back to the jurisdictional issue with Bakadakis. And this relates to what I was getting at, that he did not participate in these activities in his individual personal capacity. He was appointed to the scoreboard by the shareholder, CIP Holdings. As a result of that, he's entitled to the protections of the Fiduciary Shield Doctrine. And we laid that out. It's made explicit in Mr. Bakadakis' declaration and in his deposition testimony. In an effort to avoid the application of the Fiduciary Shield Doctrine, the appellant says, well, we asserted, asserted, that he was acting in his individual capacity, not on behalf of CIP Holdings. And therefore, this court has to take the uncontroverted allegation that he was acting in his personal capacity. But that's not how the system works when they ask for jurisdictional discovery. When they ask for jurisdictional discovery, they take on the burden of making a prima facie evidentiary case. So they can't rest on that allegation that he was acting in his individual capacity. They have to come up with proof. They have not controverted the uncontroverted testimony of Mr. Bakadakis that he was participating on behalf of CIP Holdings, not in his individual capacity. Therefore, those contacts that they want to talk about cannot be imputed to him under the Fiduciary Shield Doctrine. So they lose on that basis, and the judgment should be affirmed on that basis. Before my time's up, I want to touch on the amendment issue. And this court has multiple times denied a securities fraud plaintiff a second bite, well, a third bite at the apple when they have failed after one opportunity to amend. Judge Jolly in the Southland case, that court gave them only one opportunity to amend. And Judge Oldham, I believe, in the Heinze case, exactly the same scenario. And in both cases, in both cases, failure of the plaintiff to identify what they could add by way of amendment failed to explain how they could cure the defects that were identified by the district court. So they had one opportunity to amend. In full view of the arguments in support of a motion to dismiss, and they failed to get it right, this court has held that it's sufficient where they haven't come back and explained what they can do and how they can do it better to affirm a dismissal with prejudice. I thank you for your time, Your Honors. If there's no questions for me, I'll submit the matter. And it was an honor to be able to stand before you today. Thank you. Thank you, Mr. Johnson. Okay, Mr. Woodruff. Your Honors, this court has held that the ban on group pleading does not extend as far as my opponent would have me believe. When it is pled that one defendant . . . and I'm quoting from Barrier v. Intervoice, Bright, Inc., which is cited in my brief. When it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not as alleged which defendant made the statement and which defendant did not correct it, the fraud is sufficiently pleaded as to each defendant. My opponent talked a lot about authority, the content, the timing, and the matter of delivery. And I would submit to you that even if the business plan were not in existence, we have pleaded that other members of SCORE, board members and shareholders, represented the very same content that was in that business plan that was misleading and was false. They knew the timing when they delivered it and they controlled the matter in which they delivered it because they did it in face-to-face meetings, they did it in phone calls, and they did it in written correspondence. So they had the authority. So even if you put the business plan aside, if they export the false information and deliver it in these modes of communication, they have committed a fraud. If they know it's untrue, and we've alleged they know it's untrue, apropos the FC Barron Agreement, I disagree. You know, I said earlier at the lectern that the three implements of their artifice were the business plan, the brand capability deck, and the FC Barron Agreement. But the most important instrument of fraud, as in every case, was trust. They had the trust of my people. They gave them that agreement. They set its standard. If I tell you I own the GNO Bridge and I sell it to you, I can't avoid fraud by saying, look, you very well could have gone to the public records and determined that I didn't own that bridge. No, that's not how fraud works. If I knowingly make a misrepresentation or if I knowingly omit to tell you something that is material and I do it to gain an advantage, I have committed a fraud. So I don't think the standard is on the investor to do everything he or she can to make sure they're not being victimized by fraud. The burden is on the fraudster not to do what he's not supposed to do. So I think it rings hollow to stand up here and say they should have looked at this or they could have looked at the agreement. When it was handed back to them, they trusted. And again, I won't belabor the point, but if you look on page 17 of the complaint, paragraph 53, we outline the differences. A major difference is the June draft, which is standard, FCB is supposed to use the SCORE platform as the primary social media channel. The draft that comes back, that's signed, says SCORE intends to use the platform at least as equally as its other primary social media platforms or channels. Now I would submit to you, someone doesn't know what primary means if we're saying two different competing platforms are going to be primary. But these are significant differences. These are differences that were omitted. And again, the FCBaron agreement played a pivotal role, a crucial role. When they come to my clients and say, look, we've got FCBaron, they're going to be joining this platform. And it's the fourth richest soccer club in Europe. That gets my people's attention. So too did all the other misrepresentations about ESPN, the Dallas Cowboys, the Chicago Blackhawks. They knew the names to call to pique these people's interest. Finally, Your Honors, Rule 15 says where justice so requires. There's no limit on the number of amendments. I'm hoping that we don't get that far down the radical that you're considering amendments. But if we do, I would ask that you realize or recognize that this is a $17 million investment, and justice would require, I think, a final opportunity for them to raise the level of precision, which we think is already there. Whether you agree or disagree whether we said what we could do, it's very clear what would need to be done, and that's just bolster what we think is already sufficient. With that, I thank you for your time, attention, and your willingness to hear this case today. Thank you. Thank you, Mr. Woodruff. I think that will wrap up this morning's arguments. I'm, of course, grateful to you both, and we'll stand in recess until 9 a.m. tomorrow morning.